Upon review of all of the competent evidence of record with reference to the errors assigned, and finding good grounds to reconsider the evidence, the Full Commission REVERSES the Opinion and Award of the Special Deputy Commissioner and enters the following Opinion and Award:
***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and in the Pre-Trial Agreement, executed by the parties on May 19, 1995 as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At all relevant times, an employer-employee relationship existed between plaintiff and defendant-employer.
3. Defendant-employer was insured for workers' compensation by Liberty Mutual at all times relevant.
4. At the time in question, plaintiff's average weekly wage was $686.52.
***********
Based upon all of the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was born August 20, 1944 and began work with defendant-employer, Terminix Services, Incorporated in April, 1973 as a route sales and serviceman. Plaintiff worked as a route sales and serviceman from 1970 through approximately 1983 and in supervision and management from 1983 to September, 1992.
2. Plaintiff's duties as a route sales and serviceman included visiting with potential customers to explain his employer's services and soliciting termite or pest control business; pouring, spraying, and otherwise applying pesticides in and around customer homes or buildings; hauling, and mixing chemicals for use in termite and pest control; inspecting fumigated premises; working in confined spaces; trenching under houses and around the exterior foundations of houses, and drilling holes in house foundations.
3. The chemicals with which plaintiff worked were received in five gallon containers during the early years of plaintiff's employment and thereafter, in fifty-five gallon drums. The chemicals were re-packaged from larger to smaller containers, transported to the trucks and mixed by plaintiff on the job.
4. As a result of his work duties with defendant-employer, plaintiff was exposed to approximately 39 different toxic chemicals in various combinations on an almost daily basis during the first ten years of his employment between April, 1973 and 1983, including the following pest control chemicals: Dursban 2E, Dursban 4E, Dursban L.O., Dursban TC Termiticide, Baygon 1.5% Concentrate, Prentox Baygon 1.5%, Copper Naphthenate 40% EC, Cygon 2E, Diazinon AG-500, Diazinon 4S, TMX Diazinon 4E, Dragnet Termiticide, Farmco Woodtreat, Gold Crest Termide, GC C-100 Chlordane 8%, Killmaster 2% Chlorpyrif., Lindane-20% Prentox, MGK Pyrocide 5628, MGK Pyrocide 7207, Roach and Ant Killer, Termastic Bulk, TMX BTL, TMX GP Mal Concentrate, ULD BP-300 3% Pyre., 5% DDVP-Vapona for ULV, 3% Pyrethrin for ULV 3610, Vaponite 2-EC, and Prentox Vaponite 2-EC. The warnings contained on the Material Safety Data Sheets for many of the chemicals used by plaintiff stated that they were sufficiently toxic to kill humans if swallowed or excessively absorbed through the skin. For example, the warning for one chemical used by plaintiff, Dursban 4E, stated, "May be fatal if swallowed — Excessive absorption through skin may be fatal — Causes substantial but temporary eye injury — causes skin irritation." The warning further read, "Do not get in eyes, on skin or clothing — Wear eye protection — Avoid breathing vapors and spray mist — Handle concentrate in a ventilated area — Wear protective clothing and chemically resistant gloves when handling — Wash thoroughly with soap and water after handling and before eating or smoking — Remove contaminated clothing and wash before reuse — Keep away from food, feedstuffs and water supplies."
5. After being promoted to a management position in 1983, plaintiff continued to be directly exposed to many of the above-named chemicals and their fumes or vapors, as well as additional chemicals, two or three times each week when he was required to perform the duties of a route sales and serviceman in the place of employees who were absent or otherwise unavailable. He also assisted with the re-packaging of chemicals into smaller containers at the end of each month.
6. The chemicals to which plaintiff was directly exposed up to twelve times a month after he became a manager included Abatrol, Chlordane, Demon EC, Demon 40 WP, TMX Diazinon 4E, Dursban 2E, Dursban 4E, Dursban TC Termiticide, Empire 200, Ficam D, Ficam W, Ficam Plus, Gencor, "Inside Residual Dust", Malathion, Methylbromide, Petcor, Pyrid, Precor, Pryphone 6, Purge 2, Talan G, Terminex Aeroterm, Aeroterm 2, Sabin Dust, Sabin Granules, Safrotin, Vaponite 2-EC, and Prentox Vaponite 2-EC.
7. Plaintiff was directly exposed to high concentrations of toxic chemicals at work over extended periods of time almost every day of the work week for ten years and approximately three days per week during the nine years that he held a managerial position. Plaintiff's exposure resulted from (1) transferring chemicals from large storage containers in the central office into smaller containers for transport to work sites (an activity which continued throughout the duration of plaintiff's employment with defendant-employer); (2) applying chemicals under structures in confined and unventilated spaces, in crawlspaces and attics, in foundation walls and in the ground around the outside of structures; (3) inspecting premises for possible application of chemicals, some of which had been previously treated with chemicals by another contractor, and inspecting premises to which plaintiff's employer had applied chemicals; and (4) having an office directly above the storage area for large quantities of chemicals.
8. In 1990 plaintiff began to develop headaches and respiratory problems (shortness of breath). He presented to Dr. David A. Franks, an internal medicine specialist in Franklin, North Carolina, on August 9, 1990 with these complaints. Dr. Franks initially diagnosed plaintiff as having allergic asthma. Plaintiff began missing time from work due to respiratory problems in 1990.
9. Dr. Franks, plaintiff's primary treating physician, referred him to Dr. David Hayes Troxler, an internal medicine specialist in Asheville, North Carolina, who first saw plaintiff November 1, 1990. Dr. Troxler subsequently referred plaintiff to Dr. Donald W. Russell, a specialist in internal medicine with a subspecialty in allergy, asthma and immunology.
10. Plaintiff first saw Dr. Russell July 16, 1991 with complaints of being bothered on a year round basis with nasal obstruction and intermittent episodes of coughing and chest congestion. Dr. Russell's initial impression was that plaintiff was suffering from allergic asthma and allergic rhinitis, complicated by hypertrophic rhinitis/polyposis syndrome. He testified that while he did not really go into a lot of detail during his original diagnosis, in his mind, he thought plaintiff's asthma was probably a combination of allergic asthma and possibly related to his work around pesticide chemicals, organophosphates and pyrethrins. (Organophosphates are pesticides.)
11. In October, 1991, plaintiff had a severe flare-up of his asthma which resulted in his hospitalization from October 10, 1991 through October 17, 1991. Plaintiff's condition continued to deteriorate after his hospitalization. By late 1991, plaintiff's absences from work became quite frequent and he was unable to perform his duties on a regular basis. His treating physicians did not have any success in controlling his respiratory problems during the months of November and December, 1991 and plaintiff was required to see Dr. Franks and Dr. Russell more frequently during this period. Plaintiff also required more aggressive therapy to deal with his respiratory problems.
12. On February 5, 1992 Dr. Benjamin Douglas performed functional endoscopic sinus surgery on plaintiff.
13. Plaintiff continued to try to work, but his condition became progressively worse, requiring hospitalizations, more aggressive treatment, higher doses and more prolonged usage of steroids. Plaintiff was hospitalized by Dr. Franks for "exacerbation of asthma" from March 23, 1992 through March 28, 1992; April 10, 1992 through April 15, 1992 and from July 16, 1992 through July 20, 1992.
14. Plaintiff became totally incapable of earning wages in any employment on September 20, 1992 when he resigned his job with defendant-employer due to his inability to continue working because of difficulty in breathing.
15. After September 20, 1992, plaintiff was again hospitalized several times by Dr. Franks for "exacerbation of asthma" from February 22, 1993 through March 9, 1993; from June 21, 1993 through June 25, 1993; from August 10, 1993 through August 15, 1993; and from March 13, 1994 through March 17, 1994.
16. Plaintiff's January 24, 1994 claim for compensation was timely filed. Plaintiff was not informed by competent medical authority that there was a probable causal relationship between his employment and his disabling, severe progressive asthma and other respiratory problems until April, 1994; however, plaintiff became aware at some unspecified time shortly after June 23, 1992 that his doctors believed there was a possible causal relationship between his exposure to chemicals in his workplace and his disabling asthma and other respiratory problems.
17. Plaintiff's treating physicians, Drs. Franks, Troxler, and Russell began to discuss with each other during the early part of 1992 the possibility that plaintiff's severe asthma flare-ups and other respiratory problems were causally related to his exposure to dust and pesticides in his employment. By June 23, 1992 Dr. Russell had concluded and stated in a letter to Dr. Franks that there was a possible occupational exposure as a contributing factor to plaintiff's current condition. Dr. Franks began discussing with plaintiff the possibility that his prolonged exposure to chemicals in the workplace was the major causal factor in the development or exacerbation of his severe progressive asthma and immunodeficiency in June, 1992.
18. Approximately two years later, in a letter addressed "To Whom It May Concern" dated May 18, 1994, Dr. Franks advised that plaintiff had developed severe progressive asthma and immunodeficiency and that he believed the major exacerbation of his asthma was due to prolonged exposure to multiple allergens while working for defendant-employer.
19. Although plaintiff believed that his exposure to chemicals in his employment had contributed to his asthma based upon discussions with his doctors after June 23, 1992 concerning the possibility that his job contributed to his respiratory disease, plaintiff was not advised by competent medical authority until April, 1994 that his doctors were of the opinion that his asthma and other respiratory problems developed as a result of exposure to chemicals in his employment. By April, 1994 plaintiff had already filed a claim based on his own belief that his employment had caused or significantly aggravated his respiratory problems.
20. Plaintiff filed an Industrial Commission Form 18 with the Commission on January 20, 1994. Plaintiff's claim was filed within two years of the time when he was informed by competent medical authority in June, 1992 that there was a possible causal relationship between his exposure to chemicals in his employment and his asthma and other respiratory problems and prior to the time he was informed by competent medical authority that the major exacerbation of his asthma was employment related.
21. Dr. Russell was of the opinion that plaintiff's exposure to chemicals in his workplace was one of the factors that led to his respiratory problems and resulting disability and that plaintiff's employment with defendant-employer placed him at an increased risk of developing "respiratory disease" as compared to members of the general public not so employed. Dr. Russell opined that plaintiff is indefinitely disabled by his respiratory disease; that it would be unwise for him to return to work; and that plaintiff is not likely to show considerable improvement over the next five to ten years.
22. Dr. Russell was also of the opinion that inhalation of any one of the chemicals used by defendant-employer listed in response to plaintiff's interrogatory number 9 could have caused plaintiff's respiratory difficulties. These listed chemicals included Dursban, Malathion, Diazinon, and Vaponite; all of which contain organophosphates. Dr. Russell opined that five to 20 percent of asthmatics suffer reactive airways from organophosphates. The list of chemicals to which plaintiff was exposed also included Pyrid, Terminix MFG, Terminix Aero-Term, PT 565+, and Pirge II; all of which contain pyrethrins. Some people with asthma also have problems with pyrethrins. Dr. Russell's opinion was based upon consideration of the following: medical literature which reported case studies showing workers in the organophosphate industry who have contracted various conditions from aplastic anemia of the bone marrow to severe occupational asthma; the history gathered from plaintiff during the period of treatment which indicated that there were times when plaintiff would experience episodes of coughing, wheezing and developing congestion several hours after beginning work dating back to 1991; the absence of any significant family history of asthma; information establishing plaintiff's work exposure to insecticides and pesticides and tight dusty, moldy areas at work; his own findings during testing, examination and treatment of plaintiff; his conclusion that plaintiff's asthma did not involve a fixed obstruction in the airways, but appeared to be the result of exposure to outside agents; his consultation with others; his own information and knowledge of the chemicals and allergens to which plaintiff was exposed in the workplace and his own medical expertise.
23. Dr. Troxler was of the opinion after having treated plaintiff over a period of years, that it was "quite likely" that plaintiff's employment "significantly exacerbated his asthma". He further opined that plaintiff's exposure to pesticides during his employment with the defendant-employer caused or exacerbated plaintiff's severe progressive asthma and that plaintiff's exposure to a variety of chemicals and to potentially dusty and enclosed spaces at work could and did have a direct impact on the gradual worsening of his asthma over a period of the several years he treated plaintiff. Dr. Troxler's medical opinion was based upon personal examination and testing of plaintiff and an assessment of the circumstantial evidence surrounding the onset and development of the disease. Dr. Troxler further opined that plaintiff is totally and permanently disabled by his occupationally related asthma; that his earning capacity has been greatly impaired; and that it is unlikely that he has any potential for rehabilitation.
24. Dr. Franks opined that plaintiff's exposure at work to allergens and pesticides exacerbated, "if not caused", plaintiff's asthma; that there is a direct causal relationship between plaintiff's work and his disability; that plaintiff is totally and permanently disabled as a result of his occupationally related asthma; that plaintiff has been unable to work since 1992; that plaintiff has no wage-earning capacity; and that plaintiff has no potential for rehabilitation.
25. Plaintiff had no medical history of respiratory ailments predating his employment.
26. Plaintiff's frequent and long-term exposure to high concentrations of toxic chemicals in his employment with defendant-employer either caused, significantly contributed to the development of, or significantly aggravated his severe progressive asthma and other respiratory conditions. Plaintiff's workplace exposure to high concentrations of toxic chemicals contributed to the development of or aggravation of his asthma and other respiratory disease to such an extent that it caused plaintiff's physical incapacity to work. Plaintiff would not have been exposed to such high concentrations of pesticides, insecticides and other toxic chemicals with such frequency and over such long periods of time but for the nature of his employment. Plaintiff's employment with defendant-employer placed him at an increased risk of developing or significantly aggravating severe progressive asthma and other respiratory problems as compared to members of the general public not so employed. Plaintiff has therefore contracted a compensable occupational disease.
27. As a result of his severe progressive asthma and other respiratory conditions, plaintiff has been incapable of earning wages in his former employment or in any other employment from September 20, 1992 through the date of hearing before the deputy commissioner and continuing. Plaintiff has no current potential for rehabilitation; however, plaintiff's doctors have not determined that plaintiff has reached maximum medical improvement.
28. Plaintiff is temporarily totally disabled from working in any job in the competitive job market.
***********
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The right to compensation for an occupational disease shall be barred unless a claim is filed with the Industrial Commission within two years of death, disability or disablement as the case may be. N.C. Gen. Stat. § 97-58(c). The time of notice of an occupational disease shall run from the date that the employee has been advised by competent medical authority that he has a disability due to a work-related occupational disease. N.C. Gen. Stat. § 97-58(b).
2. Plaintiff filed his claim with the Industrial Commission on January 20, 1994, which was within two years of the time his doctors began discussing with him the possibility that his respiratory problems were work-related and prior to having been given a medical opinion that his condition was work-related. Therefore, plaintiff's claim was timely filed under the provisions of N.C. Gen. Stat. § 97-58. Underwood v. Cone Mills Corp.,78 N.C. App. 155, 336 S.E.2d 634 (1985), cert. denied, 316 N.C. 202,341 S.E.2d 583 (1986).
3. Plaintiff's exposure to toxic chemicals in his employment with defendant-employer either caused, significantly contributed to the development of, or significantly aggravated his severe progressive asthma and other respiratory conditions to such an extent that it caused the physical disability which resulted in plaintiff's incapacity to work. Rutledge v. Tultex, 308 N.C. 85,301 S.E.2d 359 (1983). Plaintiff's employment with defendant-employer placed him at an increased risk of developing or significantly aggravating severe progressive asthma and other respiratory problems as compared to members of the general public not so employed. There is a recognizable link between plaintiff's job of spraying, mixing and applying pesticides, insecticides and other toxic chemicals on a frequent basis over prolonged periods of time and an increased risk of developing respiratory problems including severe asthma. Booker v. Duke Medical Center,297 N.C. 458, 256 S.E.2d 189 (1979). Carawan v. Carolina Telephone Telegraph Co., 79 N.C. App. 703, 340 S.E.2d 506 (1986). Plaintiff has therefore contracted an occupational disease which is due to causes and conditions which are characteristic of and peculiar to his particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment. N.C. Gen. Stat. § 97-53(13).
4. Expert opinion testimony is not needed on the quantity or quality of the claimant's exposure to particular hazardous chemicals in the workplace in order to meet the proof requirements for an occupational disease. Circumstantial evidence of the causal connection between the occupation and the disease is sufficient. Keel v. H V, Inc., 107 N.C. App. 536,421 S.E.2d 362 (1992). Rutledge v. Tultex Corp., 308 N.C. 85, 301 S.E.2d 359
(1983).
5. As a result of his disability caused by his occupational disease, plaintiff became totally incapable of earning wages in any employment on September 20, 1992 when he resigned his job with defendant-employer due to his inability to continue working because of difficulty in breathing. Plaintiff is entitled to temporary total disability compensation at the rate of $426.00 per week (the maximum weekly benefit authorized in 1992) from September 20, 1992 through the date of hearing before the Deputy Commissioner and continuing until plaintiff returns to work earning the same or greater wages or until further order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
6. Plaintiff is entitled to payment of all medical expenses incurred or to be incurred as a result of his disability, for so long as such examinations, evaluations and treatments tend to effect a cure, give relief, or lessen his disability. N.C. Gen. Stat. § 97-57; N.C. Gen. Stat. § 97-25.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee provided for below, defendant shall pay to plaintiff temporary total disability compensation at the rate of $426.00 per week from September 20, 1992 through the date of hearing before the deputy commissioner and continuing until plaintiff returns to work earning the same or greater wages or until further order of the Industrial Commission. The accrued amounts shall be paid in a lump sum.
2. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff under paragraph one of this Award is approved for plaintiff's counsel and shall be paid as follows: twenty-five percent of the lump sum due plaintiff under paragraph one of this Award shall be deducted from the sum to be paid the plaintiff and shall be paid directly to plaintiff's counsel; and, thereafter, plaintiff's counsel shall directly receive every fourth compensation check due the plaintiff.
3. Defendant shall pay all medical expenses incurred or to be incurred in the future by the plaintiff as a result of his disability for so long as such examinations, evaluations and treatments tend to effect a cure or give relief when the bills for same have been submitted and approved through procedures adopted by the Industrial Commission.
4. Defendant shall pay the costs, including expert witness fees of $300.00 to Dr. Donald W. Russell, $300.00 to Dr. David Hayes Troxler and $300.00 to Dr. David A. Franks.
 S/_____________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/_____________ J. HOWARD BUNN, Jr. CHAIRMAN
S/_____________ LAURA K. MAVRETIC COMMISSIONER